## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CARLOS FERNANDES and JEAN
NEIMILLER,

        Plaintiffs,

    vs.

CITY OF JERSEY CITY, JERSEY CITY
OFFICE OF CONSTRUCTION CODE
OFFICIAL, JERSEY CITY HISTORIC
PRESERVATION COMMISSION,
JERSEY CITY POLICE DEPARTMENT,
STEVEN M. FULOP, ANTHONY B.
LEWIS, JOHN AND JANE DOES (1-
20), AND ABC CORPORATIONS (1-20)

        Defendants.

Civ. No. 2:16-cv-07789-KM-JBC

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiffs, Carlos Fernandez and Jean Neimiller, bring this action against the City of Jersey City and various officials. The Complaint alleges that the plaintiffs obtained a construction permit and began remodeling work on their home, but that the City halted work, saying that they had not obtained a required approval from the Historic Preservation Commission. When work ceased, siding had already been removed from the home, resulting in weather damage. When Fernandes complained about the situation, City officials allegedly defamed and falsely arrested him.

Before the Court is the defendants' motion (ECF No. 6) to dismiss the complaint for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiffs' Interrupted Remodeling Efforts[1]

Plaintiffs are a married couple who own and reside at a home (the "Property") located in the West Bergen-East Lincoln Park Historic District neighborhood of Jersey City, New Jersey. (Compl. ¶¶ 1, 14) Named as defendants are four municipal entities: the City of Jersey City ("Jersey City" or the "City"), the Jersey City Office of Construction Code Official (the "Building Department"), the Jersey City Historic Preservation Commission (the "HPC"), and the Jersey City Police Department (the "PD").[2] Also named as defendants are Jersey City Mayor Steven M. Fulop

---

[1]    The following facts are taken from the complaint and assumed to be true for purposes of deciding the defendants' motion to dismiss. Certain record items repeatedly cited are abbreviated as follows:

Compl. = Complaint, ECF No. 1

Br. = Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 6

Opp. = Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 8-1, Ex. A

Reply = Letter Brief of the Defendants in Reply to Plaintiff's Opposition, ECF No. 9

[2]    Of these four, at least the PD is not a proper defendant, as it is only an instrumentality of municipal government and therefore not an entity that can sue and be sued in its own right. *See Hussein v. New Jersey*, 403 F. App'x 712, 716 (3d Cir. 2010) (non-precedential) (affirming dismissal of the Jersey City Police Department because "a municipal police department is not an entity separate from the municipality" (citing N.J. Stat. Ann. § 40A:14–118)); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997) ("[W]e treat the municipality and its police department as a single entity for purposes of section 1983 liability."); *Cordial v. Atl. City*, No. 1:11-CV-01457 RMB, 2014 WL 1095584, at *9 (D.N.J. Mar. 19, 2014) ("A municipal department and the municipality itself are not deemed separate legal entities under the law, and therefore cannot both be named as parties to an action.").

The defendants claim the HPC is not a separate entity from the Building Department. (Br. 1) Whether this is so and whether the Building Department is a separate legal entity from Jersey City may depend on whether the entities were created under New Jersey statute or Constitution or only by local municipal ordnance—an issue the parties do not address and which I do not reach on this motion. *See, e.g., Von Rhine v. Camden Cty. Sheriff's Office*, No. CIV. 09-6093 JBS/AMD, 2012 WL 3776026, at *9 (D.N.J. Aug. 29, 2012)

and Police Officer Anthony B. Lewis.

On July 20, 2015, Power Home Remodeling Group, Inc. ("Power HRG"), a remodeling contractor, applied to the Building Department for a permit to remove wood siding and install vinyl siding on the Plaintiffs' Property. (*Id.* ¶¶ 15–16) On August 11, 2015, the Building Department issued a construction permit. (*Id.* ¶ 17) On August 25, 2015, Power HRG commenced removing the wood siding from the Property.

On August 28, 2015, officials from the Building Department and HPC (including Brian Blaziak, Raymond Meyer, and Dan Wrieden, who are not named as defendants) arrived at the Property and directed Power HRG to stop working. Those officials claimed that Power HRG lacked authorization to perform the work. (Compl. ¶¶ 20–21) Jersey City Police officers also arrived at the Property that day and, unprovoked, threatened to arrest Fernandes. (*Id.* ¶ 22) The officials gave no explanation for their demands at the time.

Several days later, on September 3, 2015, the Building Department issued a formal "Stop Work Order." That Order cited Plaintiffs' failure to obtain the HPC's approval before renovating the Property. (*Id.* ¶ 23) Power HRG stopped its work, leaving three quarters of the Property without siding. Because the Building Department also prohibited the Plaintiffs from covering their home by other means, the walls remained

---

(reasoning that "a county sheriff's office's capacity to be sued is not necessarily analogous to a municipal police department's capacity to be sued, as the office of the sheriff, under New Jersey law, is a constitutionally created office whereas a municipal police department is created only by local municipal ordinance."); *cf. Trinity Res., Inc. v. Twp. of Delanco,* 842 F. Supp. 782, 793 (D.N.J. 1994) ("The position of Construction Official is mandated by the Construction Act and is regulated for licensing purposes by the New Jersey Department of Community Affairs.").

Nevertheless, the Complaint fairly supports a reading of all claims against the PD, the Building Department, and the HPC as claims intended solely against Jersey City. I will treat them as such. Therefore, the clerk will be directed to drop the Building Department, the HPC, and the PD from the caption. The correction is technical; the substance of the Plaintiffs' claims is not affected.

exposed. (*Id.* ¶¶ 24, 29)

Fernandes sought an explanation, but "Jersey City refused to provide any answers to the Plaintiffs and refused to acknowledge that a permit had been issued." (Compl. ¶¶ 25–26) In October 2015, through their counsel, Plaintiffs contacted Jeremey Farrell, Corporation Counsel for Jersey City (and counsel of record for all defendants in this action). Farrell recommended that Plaintiffs' counsel contact James LaBianca, counsel for the "Planning Board" and the HPC. (*Id.* ¶ 27) Plaintiffs' counsel did so, e-mailing LaBianca to ask whether Plaintiffs could cover their home to protect it against oncoming winter weather. (*Id.* ¶ 28) LaBianca responded by offering to meet with Plaintiffs' counsel, copying Building Department officials on his e-mail. (*Id.* ¶ 30) Days later, however, LaBianca wrote to Plaintiff's counsel stating "HP[C] has no objection to your client installing temporary but sufficient, long-lasting preservation measures to protect the property, including the installation of Tyvek or some other proper board material." (*Id.* ¶ 32) Thereafter, LaBianca did not respond to the requests of Plaintiffs' counsel to arrange a meeting, or to his requests for further clarification as to what types of preservation measures and board materials the HPC would allow. (*Id.* ¶¶ 33–34)

Plaintiffs covered the Property with a plastic tarp. (Compl. ¶ 35) "Despite those efforts, the Property suffered substantial damage, including but not limited to water damage . . . ." (*Id.* ¶ 36) Afterward, the Plaintiffs decided to take no further action until warmer weather arrived, so that the Property could dry out and the damage could be assessed. (*Id.* 38)

## B. Alleged Disparate Treatment

The Plaintiffs allege that other property owners on their street have made alterations to their properties without obtaining permits or HPC authorization. These alterations have included disfavored ones, like vinyl

siding, and prohibited ones, like metal frame windows. (Compl. ¶ 38) One
couple on their street were allowed to alter their property without HPC
approval, allegedly because they "were married by Mayor Fulop and . . .
were significant supporters of Mayor Fulop's campaign." (*Id.*)

### C. The Plaintiffs' Attendance at Public Meetings

In January 2016, Plaintiffs began attending City Council meetings,
as well as public meetings that Mayor Fulop organized throughout Jersey
City. (Compl. ¶ 40) Fernandes spoke at these meetings about the
condition of his Property and "the intimidation and disrespectful
treatment he and his wife suffered at the hands of" the defendants. (*Id.* ¶
41) After one such meeting, Jersey City Council President Rolando
Lavarro "accosted Mr. Fernandes and demanded Fernandes meet with
him the next day." (*Id.* ¶ 42) On January 29, 2015, Fernandes and his
counsel met with Lavarro, who promised to assist the Plaintiffs but never
did so. (*Id.* ¶ 43)

During a February 3, 2016 public meeting, although Fernandes
"was not causing any disturbance," PD officers in plain clothes "forcibly
grabbed [him] by the arms, lifted him from his feet" and removed him
from the meeting "at the behest of Mayor Fulop." One of the PD officers
involved was defendant Lewis. (Compl. ¶¶ 44–46, 87)

A February 8, 2016 letter from Plaintiffs' counsel to Jeremey
Farrell followed. In that letter, Plaintiffs' counsel included an Open Public
Record Act ("OPRA") request for the names of the officers who had
removed Fernandes and an explanation for the removal. (*Id.* ¶ 47) The
letter reported that Fernandes had been physically injured and that both
Plaintiffs had suffered emotional injury. Additionally, the letter stated:

> Mayor Fulop made several untrue statements to
> the audience in attendance when asked why he
> had Mr. Fernandes removed. First, it is untrue
> that my client attended "every single one of these
> meetings"; as Mayor Fulop stated. It is untrue
> that my client made a "disruption for twenty to

thirty minutes" or "five to ten minutes" at any
meeting. The City never "cited for violations" his
property. To date, Mr. Fernandes has not
received any notice of any violations against his,
his wife or their property. The Mayor should
recant these slanderous. [sic]

. . . .

Mr. Fernandes has every right to attend any and
every public meeting held by Mayor Fulop and
he will continue do so. There is no basis in law
or in fact to deny him his right to attend these
meetings.

Obviously, this situation is extremely distressing
to my clients. Not only has the City ignored their
attempts to resolve this issue amicably, now it
seems the City has an agenda to assassinate the
character of Mr. Fernandes and prohibit him
from exercising his rights as a citizen of Jersey
City. The City has gone to the length of
physically assaulting my client to achieve this
agenda. Such behavior is unacceptable.

(*Id.* ¶ 47). The letter requested a meeting with Farrell, but Plaintiffs'
counsel did not receive any response.

Plaintiffs eventually received a Use of Force Report, but it provided
inadequate information. This prompted Plaintiffs' counsel, on March 25,
2016, to demand that that the City Clerk respond more fully to the OPRA
request. (Compl. ¶ 51) That same day, Plaintiffs' counsel wrote to Jeremy
Farrell seeking a further response to the February 8, 2016 letter; noting
the city clerk's inadequate response to the OPRA request; and raising a
new grievance.

That new grievance related to Mayor Fulop's alleged behavior
towards Fernandes during a March 14, 2016 public meeting. (*Id.* ¶ 52)
The letter stated:

On March 14, 2016, I attended a public meeting
in Ward F at the Bethune Center with Carlos
Fernandes. There, my client asked the Mayor a
question, to which the Mayor again answered
that my client is a disgruntled person because

his property had been cited for numerous violations by the City, and that the matter is currently the subject of litigation. Again, to date, Mr. Fernandes has not received any notice of any violations against him, his wife or their property. The Mayor knows his statements are untrue. The Mayor must be aware of the true circumstances in this matter because after he made the untrue statements at the February 3, 2016 meeting in Ward A I wrote to you informing you that his statements were untrue.

The Mayor's behavior toward my client is unacceptable. Instead of seriously addressing legitimate issues my client has with the City's handling of abruptly halting construction at his home after the City issued a valid permit for the same construction (and the City's refusal to allow my client to go forward with construction resulting in significant damage to his property), the Mayor is waging a smear campaign against my client in an attempt to minimize his claims against the City.

(*Id.*)

### D. The Plaintiffs' Tort Claim Notice and Complaint

On November 25, 2015—after the work had been shut down and the Property had sustained damage, but before the Plaintiffs began attending public meetings—the Plaintiffs filed a Tort Claim Notice (a "TCN"). (Compl. ¶ 39; *see* Br. 14)[3] On or about April 18, 2016, Plaintiffs' counsel received a response to the TCN from Jersey City, disclaiming liability. (*Id.* ¶ 54)

On September 22, 2016, the Plaintiffs filed a civil complaint in the Superior Court of New Jersey, Law Division, Hudson County. (*See*

---

[3] The parties do not provide a copy of the November 25, 2015 TCN, and the Complaint does not describe it. The defendants argue that the Plaintiffs failed to file a TCN only with respect to the Plaintiffs' Count 5 defamation claim. This I interpret as an implied concession that the Plaintiffs' TCN did address the Count 6 negligence claim.

Compl. p.1) The defendants removed the action to this Court on October 24, 2016. (*See* ECF No. 1)

The complaint is in six counts—four under 42 U.S.C. § 1983 and two under state tort law:

- **Count 1:** Violation of the Plaintiffs' right to Equal Protection under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 ("Section 1983") (Compl. ¶¶56–66) (*against the City*)[4];

- **Count 2:** Violation of the Plaintiffs' right to procedural due process under the Fourteenth Amendment, pursuant to Section 1983 (*id.* ¶¶67–76) (*against the City*);

- **Count 3:** Violation of the Plaintiffs' First Amendment speech rights, pursuant to Section 1983 (Compl. ¶¶ 77–82) (*against the City, Mayor Fulop in his individual capacity, and Anthony B. Lewis in his individual and official capacities*[5])

- **Count 4:** Unlawful seizure and false arrest, in violation of the Fourth Amendment, pursuant to Section 1983. (*Id.* ¶¶83–91) (*same parties as Count 3*)

- **Count 5:** Defamation by slander. (Compl. ¶¶ 92–98) (*against Mayor Fulop in his individual capacity*)

- **Count 6:** Negligence. (*Id.* ¶¶ 99–104) (*against the City*)

## II.    LEGAL STANDARD ON MOTION TO DISMISS

The defendants move to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim

---

[4]    As noted above, counts asserted against the PD, the Building Department and the HPC are treated as claims against the City. *See* n.2, *supra.*

[5]    The opening paragraph of the complaint refers to "Steven M. Fulop, individually" but "Anthony B. Lewis" with no such qualifier. (*See* Compl. p.1) Therefore, I construe the complaint as suing Lewis in both his individual and official capacity.

upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

As the Third Circuit instructed post-*Iqbal*, "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (*quoting Iqbal*, 556 U.S. at 662). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.'" *Iqbal*, 556 U.S. at 662 (citing *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

The government moves to dismiss the complaint on a number of grounds. I first consider whether Counts 1 through 4 state a constitutional claim under 42 U.S.C. § 1983 (section III.A); I next consider whether any such liability extends to the City under *Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978) (section III.B); I then consider the qualified immunity of defendants Fulop and Lewis in their individual capacities (section III.C); and finally I consider the sufficiency of the state law tort claims, Counts 5 and 6 (section III.D).

### A. Sufficiency of Section 1983 Claims

To state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250 (1988).

#### 1. *Count 1—Equal Protection*

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a traditional equal protection claim, a plaintiff must allege facts showing the existence of purposeful discrimination. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). The plaintiff must have received treatment different from that received by other individuals similarly situated. *Id.*

Most commonly, a plaintiff will allege that a state actor intentionally discriminated because of his or her membership in a protected class, such as a racial or religious minority. *Lande v. City of*

*Bethlehem,* 457 Fed. App'x 188, 192 (3d Cir. 2012) (citing *Chambers,* 587 F.3d at 196). The Plaintiffs here allege that their neighbors were allowed to perform comparable work on their homes. That allegation, however, does not place Plaintiffs in a protected class.

Alternatively, however, a plaintiff may assert an Equal Protection claim under a "class of one" theory. *Lanin v. Borough of Tenafly,* No. 2:12-02725 KM MCA, 2014 WL 31350, at *8 (D.N.J. Jan. 2, 2014).

> A "class of one" Equal Protection claim asserts that a person was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L.Ed.2d 1060 (2000). The plaintiff must allege: "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006).

*Id.* at *7; *see also Ecotone Farm LLC v. Ward,* 639 F. App'x 118, 124 (3d Cir. 2016) (non-precedential).

Here, the allegedly "similarly situated" individuals are "other homeowners in the Historic District"— more specifically, property owners on the Plaintiffs' street whom the City has allowed to alter their properties in ways Jersey City guidelines disfavor or prohibit, "without HPC approval or valid permits." (Compl. ¶¶ 38, 63) The Plaintiffs never expressly allege that all properties in the Historic District need HPC approval prior to renovation. Nevertheless, on a motion to dismiss, I will assume this to be the case[6] and accept that Plaintiffs and their neighbors are therefore similarly situated.

---

[6]     Such an assumption would not appear to be unfounded. *See* Jersey City Code of Ordinances, Municipal Code § 345-30, *available at* https://library.municode.com/nj/jersey_city/codes/code_of_ordinances ("No permit shall be issued or amended nor shall any construction, alteration, minor alteration, ordinary maintenance and repair or demolition be started on a landmark building nor on any sign, building, structure, object, site or

As for the second element, there can be no dispute that the Plaintiffs allege intentional action.

Turning to the third element, the Plaintiffs allege that Building Department and HPC officers Blaziak, Meyer, and Wrieden ordered them to cease construction on their Property. (Compl. ¶¶ 20, 60, 71, ) The Plaintiffs, in their brief, argue that "[i]t can easily be inferred from the complaint that the Plaintiffs not only did not support Mayor Fulop but were outspoken opponents of Mayor Fulop." (Opp. 13) The only relevant allegation in the Complaint is somewhat different: "One couple who conducted alterations to their property without HPC approval were married by Mayor Fulop and . . . were significant supporters of Mayor Fulop's campaign." The Complaint does not allege that the Plaintiffs publicly spoke out against any of the defendants prior to January 2016, or against Mayor Fulop at any time. (See Compl. ¶ 40–41) It does not allege that any officer or defendant involved in enforcing the Stop Work Order knew that they did not support Mayor Fulop (if indeed that was the case). Nor, conversely, did any defendant allegedly suggest that support for Mayor Fulop would expedite approval of their renovation efforts. In short, the allegations of politically-based discrimination are quite weak.

Still, the class-of-one claim does not require a political motive—only the lack of any rational basis for the disparate treatment.[7] The Complaint alleges that the reason given for shutting down work could not have been the real reason. See Lanin, 2014 WL 31350, at *8 (in analyzing the rational basis element on a motion to dismiss, "[a] sufficient

---

landscape feature within a designated historic district, whether or not a construction permit is required, prior to a filing of an application for review by the Historic Preservation Commission or the issuance of either a Certificate of Appropriateness or a Certificate of No Effect.").

[7] Of course, First Amendment retaliation, alleged in Count 3, is a different matter.

allegation that Defendants' stated motivations were not the real ones might support a cause of action."). An insincere explanation may suggest that there is no good one. The Plaintiffs allege, for example, that the City (at least initially) refused to acknowledge that they possessed a building permit; that the City permitted neighbors to perform similar construction without HPC authorization, and that in at least one case there was an appearance of political favoritism. No other, acceptable basis for the alleged disparate treatment appears on the face of the complaint.

Class-of-one Equal Protection claims are difficult to prove, and they rarely succeed. Such a claim has, however, been alleged here.

### 2.     *Count 2—Procedural Due Process*

To state a procedural due process claim, the Plaintiffs must establish (1) that they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty and property, and (2) that the procedures available to them did not provide due process of law. *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011). It is not controversial that real property ownership generally constitutes a protected property right. Whether the Plaintiffs had a protected property interest in renovating their home, or in receiving all requisite approvals and permits to do so, is less certain.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972). *Cf. Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 (3d Cir. 1997) ("[T]he law of this circuit recognizes that 'an entitlement may exist for a benefit sought but not yet obtained if state law limits the exercise of discretion by the state official responsible for conferring the benefit.'" (quoting *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 679 (3d Cir. 1991)).

The Complaint fails to state specifically the manner in which enforcement of HPC rules deprived Plaintiffs of a property right. State law, the source of property rights, suggests that they would have great difficulty in doing so. *Cf. Waters v. Twp. of Galloway*, 286 N.J. Super. 222, 237–38, 668 A.2d 1086, 1095 (App. Div. 1995) ("The legitimacy of entitlement, in instances relating to denial of building or other municipal permits, is based on whether plaintiffs have complied with all legal requirements contained in the local codes or ordinances.").

Even assuming that there is a protected property right, however, the Complaint fails to state a procedural due process claim. Among other things, Plaintiffs never allege that they even attempted to take advantage of state and local procedures for challenging the defendants' allegedly erroneous Stop Work Order.

A state "provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 597 (3d Cir. 1995) (affirming district court's conclusion that "New Jersey provides a constitutionally adequate process for challenging wrongful zoning decisions"), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). Therefore, "when a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process . . . whether or not the plaintiff avails

him or herself of the provided appeal mechanism." *Id.* (citations and internal quotations omitted); *see also Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir. 1988) (municipality's delay in issuing building permit did not raise procedural due process where state "affords a full judicial mechanism with which to challenge the administrative decision"), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003).

Jersey City's Code of Ordinances, Section 345-30 sets forth a clear set of instructions for applying for a Certificate of Appropriateness or a Certificate of No Effect (i.e., approval) from the HPC. The same Section provides for a review process with a written decision by the HPC and a procedure for appealing the HPC's decision to the Board of Adjustment.[8] Land Development Ordinance of the Jersey City, Hudson County, New Jersey, § 345-30.

The Complaint makes no mention of these available procedures. It does not allege that the Plaintiffs attempted to take advantage of them and were turned back in some way. It does not allege that the procedures are inadequate. A substantive challenge under state law may be possible, but (at least as currently alleged) there is no procedural due process claim. "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. . . . [A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d

---

[8]    I also note that the ordinance provides for an emergency procedure for certifying the immediate necessity for HPC approval in the event that a property owner needs an immediate permit to "commence to stabilize, secure, repair or protect a landmark building, structure, object, site or landscape feature damaged" by "an act of God or any other unexpected event". *Id.* The Plaintiffs' failure to avail themselves of this procedure, if it was truly available, could conceivably defeat their claims for lack of causation.

Cir. 2000).

The Plaintiffs also allege that, after issuing the Stop Work Order, "Jersey City refused to provide any answers to the Plaintiffs and refused to acknowledge that a [construction] permit had been issued" (Compl. ¶ 26), and that they "were not given any right to appeal, contest or be heard regarding the 'Stop Work Order' . . . ." (*Id.* ¶ 73) These allegations, directed to the allegedly vanished construction permit, come closer to stating a claim,[9] but still fail. These are no more than bare-bones conclusory statements of a procedural deprivation. The defendants cannot have failed to "give" any right to appeal unless plaintiffs allege, for example, that they filed or attempted to file such an appeal. What appears from the face of the complaint is a letter-writing campaign, accompanied by in-person demands and accusations of bureaucratic indifference. And even as to that, the only specific allegations relate to e-mail communications between Plaintiffs' counsel and LaBianca.[10] Otherwise, the Plaintiffs fail to give any indication of who (beyond "Jersey City") they asked for answers, what they were told, and what (if any)

---

[9] A protected property right, for example, is easier to find in the case of a permit already granted. *See, e.g., Fairview Ritz Corp. v. Borough of Fairview*, No. CIV.A. 9-875 JLL, 2013 WL 5946986, at *14 (D.N.J. Nov. 6, 2013) (reasoning that "the due process requirements attendant upon the denial of an application for a property right *not yet granted* where an appellate process was available but the plaintiff did not take advantage of it, on the one hand, and the revocation of a *previously granted* certificate without notice or a pre-deprivation hearing, on the other, require a different analysis"); *Alvin*, 227 F.3d at 116 ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, *unless those processes are unavailable* or patently inadequate." (Emphasis added.)

[10] The allegations fail to show that any of LaBianca's representations amounted to deprivation of process by the defendants. To the contrary, the plaintiffs allege that LaBianca told Plaintiffs' counsel they could install "long-lasting preservation measures to protect the [P]roperty . . . ." (Compl. ¶ 32) The decision not to do so (i.e., to cover the Property with only plastic tarp), appears to have been the Plaintiffs' own decision. (*See id.* ¶ 35)

statutory rights they sought to invoke.[11] There may be more, but it does not appear in this Complaint. Without even this minimal factual enhancement, I cannot conclude that a procedural due process claim is facially plausible. *See Fowler*, 578 F.3d at 210.[12] The motion to dismiss Count 2 for failure to state a claim is therefore granted.

### 3. *Count 3—First Amendment Retaliation*

Count 3 is a claim that Jersey City, Mayor Fulop, and Officer Lewis retaliated against the Plaintiffs for exercising their First Amendment rights at public meetings. Such a retaliation claim requires allegations of "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected

---

[11]    For example, the Plaintiffs fail to mention the municipal and state procedures available pursuant to Jersey City's Code of Ordinances and New Jersey's Uniform Construction Code Act (UCCA), *see, e.g.*, N.J.S.A. 52:27D-119–141, which, in and of themselves, provide for due process procedures and protections that likely pass constitutional muster. *See, e.g., Plemmons v. Blue Chip Ins. Servs., Inc.*, 387 N.J. Super. 551, 568, 904 A.2d 825, 836 (App. Div. 2006) (denied construction permits and stop work orders did not constitute deprivation of procedural due process in light of procedures and remedies afforded by New Jersey statues, including the UCCA).

[12]    In their briefing, the parties address whether Plaintiffs have stated a substantive due process claim as well. But Count 2 of the Complaint is styled as a procedural due process claim, and a substantive due process would have to be alleged far more specifically. For what it is worth, the defendants' issuance and enforcement of the Stop Work Order and refusal to acknowledge the construction permit that the Plaintiffs allegedly secured, even if there was some selective enforcement, is not alleged to reach the level of shocking the conscience. *See United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 402 (3d Cir. 2003) (holding that substantive due process claims in the land use context must be held to the shocks-the-conscience test and explaining that "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives."); *Shamrock Creek, LLC v. Borough of Paramus*, No. CIV.A. 12-2716, 2014 WL 4824353, at *4–5 (D.N.J. Sept. 24, 2014) (collecting land-use cases in which courts declined to find the shocks-the-conscience test met); *see also Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 287 (3d Cir. 2004) ("[W]e do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation.").

conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006); *see also Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006); *Citizens For A Better Lawnside, Inc. v. Bryant*, No. 05-4286 RBK, 2006 WL 3825145, at *6 (D.N.J. Dec. 22, 2006). The first element is an issue of law; the second and third are questions of fact. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001); *Johnson v. Lincoln Univ.*, 776 F.2d 443, 454 (3d Cir. 1985).

The first element—constitutionally protected speech—is clearly present. The Plaintiffs allege that Fernandes's speech at meetings concerned "the failings of Jersey City, the Building Department, the HPC and their related officials, and the condition of this home" as well as "the intimidation and disrespectful treatment [the Plaintiffs] suffered at the hands of Jersey City, Building Department Officials, . . . and Jersey City police officers." (Compl. ¶¶ 41, 79) A core purpose of the First Amendment is to protect speech on matters of public interest. There is no question that speech by a private citizen concerning matters of public concern, and especially governmental affairs, is constitutionally protected conduct. *See Mills v. State of Ala.*, 384 U.S. 214, 218, 86 S. Ct. 1434 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs."). Courts in fact afford heightened protection to speech given in public forums, such as public meetings. *Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 201 N.J. 544, 569, 993 A.2d 805, 819 (2010).

The defendants argue that the Plaintiffs' allegations regarding "the failings of Jersey City" are too vague and implausible to meet *Twombly*'s and *Iqbal*'s pleading standards. I disagree. Viewing the complaint in its entirety, it is clear what "failings" are referred to. Fernandes objects to

the thwarted renovation attempts, the resulting damage to his home, and the City's allegedly discriminatory or irrational enforcement of the rules. (*See* Compl. ¶¶ 23–38, 41, 47, 52, 78–79) The particulars of his speech at the meetings may be fleshed out in discovery.

As for the second and third elements, the Plaintiffs say the defendants violated Fernandes's First Amendment rights: (1) when police officers, at Fulop's instruction (in reaction to Fernandes's prior railings against Jersey City), removed him from the February 3, 2016 public meeting; (2) when Mayor Fulop made allegedly defamatory comments about Fernandes during the February 3, 2016 meeting and again at a March 14, 2016 meeting in response to Fernandes's questions; and (3) when police officers intimidated Fernandes at public meetings by their proximity to him. (Compl. ¶¶, 44–47, 52, 80)[13]

The first letter from Plaintiffs' counsel to Jeremey Farrell complains that, at the February 3, 2016 meeting, Mayor Fulop stated publicly that Fernandes's Property has been cited for violations and that he had Fernandes removed because Fernandes frequently disrupts public meetings. (*Id.* ¶ 47) In the second letter to Farrell, Plaintiffs' counsel states that when Fernandes asked Mayor Fulop a question during the March 14, 2016 meeting, Mayor Fulop accused Fernandes of being disgruntled because his property has been cited for numerous violations. (*Id.* 52) These are sufficient allegations of retaliation *because* Fernandes had vocalized concerns at public meetings. Such steps could deter a reasonable person from speaking further.

---

13    "[I]t has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 177 (3d Cir. 2016). Here, however, the Complaint gives rise to a plausible inference that the Mayor acted, and directly ordered the police to implement retaliatory acts, a different situation.

Defendants' motion suggests a couple of caveats. Although neither supports dismissal at present, I discuss them briefly for the parties' guidance.

The first caveat pertains to Fernandes's alleged removal from the meeting and intimidation by police presence. To be sure, "viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interest." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S. Ct. 948, 955 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). Nevertheless, the law permits a public body to control its proceedings in a content-neutral manner by stopping a speaker who is disruptive or who disregards a meeting's properly-confined subject matter limitations. *See Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 201 N.J. 544, 571, 993 A.2d 805, 820–21 (2010); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004).

In *Eichenlaub*, for example, a plaintiff who attended a Township Board of Supervisors meeting was removed during the public comment period because he was "repetitive and truculent," and "repeatedly interrupted the chairman of the meeting." *Id.* at 281. The United States Court of Appeals for the Third Circuit affirmed the district court's dismissal of the plaintiff's First Amendment claims, agreeing that the chairman's motive for ejecting the plaintiff "was the perfectly sustainable and content-neutral desire to prevent his badgering, constant interruptions, and disregard for the rules of decorum." *Id.* To let a speaker "hijack" or "filibuster" the proceedings, the Court emphasized,

would only "impinge on the First Amendment rights of other would-be participants." *Id.*

The defendants claim that any restrictions on Fernandes's speech were content-neutral and served a constitutionally permissible purpose. The issue here, however, is whether the Plaintiffs have adequately alleged otherwise. I think they have. The motion to dismiss the Count 3 First Amendment retaliation claim based on Fernandes's removal and the presence of police cannot be granted on these fact-intensive grounds.

The second caveat pertains to Mayor Fulop's alleged defamatory statements. Although I have already sustained Count 3, I nevertheless consider whether to excise those statements as part of the basis for a First Amendment retaliation claim.

Where an alleged act of retaliation is one that takes the form of an official's own speech—which may itself enjoy First Amendment protection—the Third Circuit "employ[s] a more specific test to determine whether the official's speech amounts to a retaliatory act. [It] ask[s] whether there was a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (internal quotation marks omitted). *See also McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001) ("When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act.").

In *Koren v. Noonan*, 586 F. App'x 885, 888 (3d Cir. 2014), where the plaintiff alleged the defendants "smeared his unblemished professional record in an attempt to derail his ongoing candidacy[,] . .

.[t]he question . . . [was] not whether [the defendants'] remarks were defamatory—it [was] whether they would have deterred a person of ordinary firmness . . . from pursuing a similar run for office." *Id.* at 888 (internal quotation marks and citation omitted). Cautioning that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism," the court concluded that speech "which involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow,' would not dissuade a person of ordinary firmness from seeking political office." *Id.* (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)).

As exacting as the Third Circuit's test is, I think that Plaintiffs have alleged statements by Mayor Fulop that need not be, but could be, construed as threats of adverse regulatory action, in the context of all the facts. I will not strike those statements from Count 3, but leave them as part of the overall picture of alleged First Amendment retaliation.

### 4.    *Count 4—Fourth Amendment*

Based on events at the same February 3, 2016 meeting discussed above, Count 4 alleges that Jersey City, Mayor Fulop, and Officer Lewis violated the Fourth Amendment's protection against unreasonable seizures. *See* U.S. Const. amend. IV. In particular, Plaintiffs allege that Fernandes was falsely arrested. (Compl. ¶¶ 87–88)

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)).

The defendants attack the second element, *i.e.*, asserting that there was probable cause. The police officers, they say, possessed probable

cause because Fernandes had previously caused a disturbance and was engaging in similar conduct during the February 3, 2016 meeting. (Br. 11; Reply 4–5) In support, Defendants cite the February 8, 2016 letter from Plaintiffs' counsel to Jeremey Farrell, described in the Complaint. (Compl. ¶ 47) That letter, however, is not an admission of wrongdoing by Fernandes; it states only that *Mayor Fulop told the audience* that Fernandes was removed because he disrupted public meetings. (*Id.*) The Complaint alleges, in so many words, that the Mayor's statement was false. On a motion to dismiss standard, I cannot resolve the fact-bound issue of probable cause.

I move on to the first element: whether the Complaint alleges that Fernandes was allegedly "arrested" or "seized." The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 1877 (1980) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081). The United States Supreme Court has described the level of restraint that must be imposed for constitutional safeguards to apply:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* at 554 (footnote omitted); *see also Berg v. Cty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("A person is seized for Fourth Amendment

purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

The Complaint alleges that Mayor Fulop instructed Jersey City police officers to remove Fernandes from a public meeting; that the police officers laid hands on Fernandes and ejected him; that they did so without probable cause or explanation; and that Fernandes suffered physical injury as a result. (Compl. ¶¶ 44–45, 85–86, 88) Plaintiffs also allege that the presence of officers intimidated them; that allegation may turn out to be superfluous, but it does not detract from the clear allegation of a seizure. Plaintiffs' allegations of a "seizure" suffice at this stage.

Plaintiffs allege that the seizure was ordered by the Mayor.[14] Liability can "extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *see also Kilbourn v. Thompson*, 103 U.S. 168, 200 (1880) ("[H]e who assumes the authority to order the imprisonment of another is responsible for the acts of the person to whom such order is given, when the arrest is without justification."); *cf. Garcia v. City of Paterson*, No. 11-CV-6587, 2015 WL 857801, at *3 (D.N.J. Feb. 27, 2015) (dismissing false arrest claim against defendant who gave information to police relevant to plaintiffs' arrest because he did not "instigate" or 'intentionally cause" the arrests).

These allegations suffice to state a Fourth Amendment claim for an unreasonable seizure of the person. The motion to dismiss is denied as to Count 4.

### B. *Monell* **Liability of the City**

I have found that Counts 1, 3, and 4 state Section 1983 claims for violations of the Fourteenth Amendment's Equal Protection clause and

---

14   Plaintiffs seem to allege that more than one officer was involved, but only Lewis is currently identified.

the First and Fourth Amendments. (*See* Section III.A, *supra.*) I now consider whether any such liability is sufficiently alleged to extend to the City itself.[15]

A City, of course, can act only through people—its officers and employees. A municipality's liability under Section 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91, 98 S. Ct. 2018, 2035–36 (1978) (a municipality may be liable under section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). Within this framework, longstanding jurisprudence recognizes two grounds for "*Monell* liability": (1) unconstitutional policies and customs, and (2) inadequate training of employees.[16]

First, a municipality or local government unit can be found liable under Section 1983 "where its policies are the 'moving force [behind] the constitutional violation'" that is alleged. *City of Canton Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694). That liability-creating "force" may be exercised through formal policy or custom. Policy is made when a "'decisionmaker possess[ing] final authority to establish

---

15      Again, claims against the City are construed to include the claims asserted against the PD, the Building Department, and the HPC. *See* n.2, *supra.* As noted above, the Complaint might be construed as suing Lewis is in his official capacity, as well as his personal capacity. A lawsuit against a government official in his official capacity is effectively a suit against the office. *Brandon v. Holt*, 469 U.S. 464, 471, 105 S. Ct. 873, 878 (1985). I therefore do not discuss official-capacity claims for damages separately from those against the City.

16      The Plaintiffs use the wrong terminology (respondeat superior), but have the right idea. They seek to hold the City liable based on municipal policies and the City's failure to train employees and officers. (Opp. 7–8)

[local] policy with respect to the action' issues an official proclamation, policy, or edict," *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)), while "[c]ustom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually constitute law." *Bielevicz v. Dubinion*, 915 F.2d 845, 850 (3d Cir. 2007) (citing *Andrews*, 895 F.2d at 1480).

"A municipal defendant need not, however, promulgate an official legislative policy or follow a repeated practice to face liability. . . . The policy or custom requirement may [] be satisfied by a single official act by a local governmental body, or official with final decisionmaking authority." *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 366–67 (D.N.J. 2000); *see also Langford v. City of Atl. City*, 235 F.3d 845, 846–50 (3d Cir. 2000). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S. Ct. 1292, 1300 (1986).[17]

The Third Circuit has summarized the above custom-and-policy principles in simpler terms:

> "[A] municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted

---

[17]     *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 125, 108 S. Ct. 915, 925 (1988) ("[S]tate law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.").

within the government entity; second, liability
will attach when the individual has policy
making authority rendering his or her behavior
an act of official government policy; third, the
municipality will be liable if an official with
authority has ratified the unconstitutional
actions of a subordinate, rendering such
behavior official for liability purposes."

*Ecotone Farm LLC v. Ward,* 639 F. App'x 118, 127 (3d Cir. 2016) (quoting
*McGreevy v. Stroup,* 413 F.3d 359, 367 (3d Cir. 2005) (citations omitted)).

Second, *Monell* liability based on a municipality's failure to train or
supervise employees "requires a showing that the failure amounts to
'deliberate indifference' to the rights of persons with whom those
employees will come into contact. Additionally, the identified deficiency in
a city's training program must be closely related to the ultimate injury; or
in other words, the deficiency in training [must have] actually caused the
constitutional violation." *Thomas v. Cumberland Cty.,* 749 F.3d 217, 222
(3d Cir. 2014) (internal quotation marks and citations omitted). "[I]n
order for a municipality's failure to train or supervise to amount to
deliberate indifference, it must be shown that (1) municipal policymakers
know that employees will confront a particular situation; (2) the situation
involves a difficult choice or a history of employees mishandling; and (3)
the wrong choice by an employee will frequently cause deprivation of
constitutional rights." *Carter v. City of Phila.,* 181 F.3d 339, 357 (3d
Cir.1999) (citations and footnote omitted). Therefore, "[a] pattern of
similar constitutional violations by untrained employees is 'ordinarily
necessary' to demonstrate deliberate indifference for purposes of failure
to train." *Connick v. Thompson,* 563 U.S. 51, 61 (2011) (citations
omitted).

1. *Monell* liability for Equal Protection Claim (Count 1)

With respect to their Equal Protection claim (Count 1), the
Plaintiffs allege that the Building Department issued a Stop Work Order
on their Property; that the City, through the Building Department and

the HPC, refused to let work continue without HPC approval; that Jersey City refused to acknowledge that the Building Department had issued a building permit for the renovations; and that the City and its departments have allowed other property owners in the same historic neighborhood to perform similar renovations without HPC approval or permits. (Compl. ¶¶ 23, 26, 61–64)

On the face of the Complaint, Plaintiffs allege no City policy or custom that would have resulted in the injuries alleged. No established policy of discrimination is alleged. At most, one could plausibly infer a pattern of lax enforcement, from which the Plaintiffs believe they, too, should benefit. Therefore, the Plaintiffs have failed to allege that any widespread policy or custom was "the moving force" behind the alleged constitutional deprivation. *See Monell*, 436 U.S. at 694.

More plausibly, the Plaintiffs urge that the City is nevertheless liable based on a "single decision" to enforce an ordinance in a discriminatory manner. (Opp. 7) The whole rationale of *Monell*, recall, is that liability must be direct, not imputed. Such direct involvement may be found where the defendant allegedly "was the final policymaker with regard to enforcing [the] ordinance." *Ecotone Farm LLC v. Ward*, 639 F. App'x 118, 127 (3d Cir. 2016). Thus "[n]o one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . ." *Pembaur v. City of Cincinnati*, that 475 U.S. 469, 480, 106 S. Ct. 1292, 1298 (1986).

The Complaint alleges, not just an arbitrary decision by a subordinate official, but the formal issuance of a Stop Work Order by the agency or agencies with decision-making responsibility and authority. There is room for doubt as to whether *Monell* liability would ultimately be found, but that is not the standard now. These allegations are sufficient to permit further exploration in discovery.

Accordingly, Count 1 of the Complaint adequately alleges municipal liability under *Monell*.

### 2. Counts 2, 3, and 4 Against Jersey City

Count 2 has already been dismissed for failure to state a claim. I consider whether Counts 3 and 4 (First Amendment retaliation and Fourth Amendment illegal seizure) adequately allege *Monell* liability of the City.

The Complaint fails to allege that the actions of the police officers at the public meetings implemented a preexisting policy. Nor do they allege facts suggesting substandard training, or a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. at 61 (2011). I would not find *Monell* liability on this basis.

Once again, however, the Complaint alleges that these actions were undertaken at the direct order of the Mayor. It is not implausible that the Mayor has the authority to direct the actions of the police, or to control the proceedings at a public meeting. That is a sufficient allegation that the Mayor is an "official with final decisionmaking authority" who spoke for the City in this instance. Counts 3 and 4 adequately allege municipal liability under *Monell*.

### C. Qualified Immunity of Fulop and Lewis

Counts 3 and 4, in addition to naming the City, name Mayor Fulop and Officer Lewis in their individual capacities. As individuals, they are entitled to assert personal defenses, such as qualified immunity.

Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006) (quoting *Hunter v.*

*Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L.Ed.2d 589 (1991)). To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. A right is clearly established if 'its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right.'" *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 398–99 (3d Cir. 2003) (quoting *Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000)).

### 1. First Amendment Claim (Count 3)

As discussed, Count 3 adequately pleads that Lewis and Fulop violated Fernandes's First Amendment rights. The remaining qualified immunity question, then, is whether the relevant right was clearly established at the time. Count 3 alleges two alleged retaliatory actions: (1) Fernandes's removal from the February 3, 2016 public meeting and (2) Mayor Fulop's defamatory statements during the February 3, 2016 and March 14, 2016 meetings.[18]

*Fernandes's Removal*

In *Monteiro v. City of Elizabeth*, the United States Court of Appeals for the Third Circuit addressed whether a public official who excludes a citizen from a public meeting may enjoy qualified immunity. 436 F.3d 397, 404–05 (3d Cir. 2006). "It is clearly established," the Court explained, "that when a public official excludes an elected representative or a citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment"; and it is likewise "clearly established that content-based restrictions on speech in a public forum

---

[18]     The Plaintiffs never allege that Lewis was one of the police officers who intimidated them with their nearby presence at public meetings, or that Mayor Fulop directed officers to stand near them. (See Compl. ¶ 80) I therefore do not discuss this form of alleged intimidation here.

are subject to strict scrutiny, while viewpoint-based restrictions violate the First Amendment regardless of whether they also serve some valid time, place, manner interest." *Id.* at 404–05. Whether the officer violated clearly established law, then, will depend in part upon his or her motivation. Motivation being a question of fact, the court affirmed the district court's decision to deny the defendant's post-trial motion for judgment as a matter of law based on qualified immunity. *Id.* at 405.

The Plaintiffs' First Amendment claim here raises a qualified immunity issue similar to the one that was tried in *Monteiro. A fortiori,* it is inappropriate for resolution at the motion to dismiss stage. The allegations here create a factual issue as to whether Mayor Fulop and Officer Lewis (a) acted properly to maintain order at public meetings or instead (b) sought to prevent Fernandes from vocalizing his opposition to the City's actions in connection with his Property.

Defendants further suggest that this alleged arrest, even if retaliatory, was supported by probable cause. *See Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012). *See also Primrose v. Mellot,* 541 Fed. Appx. 177, 180 n.2 (3d Cir. 2013) (noting that Third Circuit has "not decided whether the logic of Hartman applies to retaliatory arrest claims," and reasoning that an officer who the plaintiff claimed issued her a retaliatory summons for engaging in protected speech would be entitled to qualified immunity because a jury had found that the officer had probable cause.); *Cresci v. Aquino,* No. CV134695KMJBC, 2017 WL 1356322, at *10 (D.N.J. Apr. 10, 2017). Again, such assertions of qualified immunity leapfrog the factual issue here. The Complaint alleges that Fernandes was not being disruptive, and that the Mayor simply ordered him removed without cause. (See Compl. ¶¶ 44–46, 88–89.) Such application of force, without probable cause (and, *a fortiori,* for the unconstitutional purpose of silencing the Plaintiff) would set forth a clearly established violation. That is what the Complaint alleges.

While qualified immunity issues must be addressed, and should be resolved, at the earliest possible stage, they often require factual development. This is such a case. The need to develop the factual record renders dismissal on the basis of qualified immunity inappropriate at this stage.[19]

Qualified immunity, then, does not bar the assertion of Count 3 against Mayor Fulop and Officer Fulop based on their having allegedly forcibly removed Fernandes from the meeting.

### Mayor Fulop's Defamatory Statements

Count 3 alleges that Mayor Fulop's defamatory statements, too, constituted retaliation for Fernandes's exercise of First Amendment rights. Count 3, as I have stated, is going forward in any event, but I discuss this alternative theory briefly.

---

[19]    Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. *See Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (qualified immunity may turn on disputed issues of fact); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir.1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."). Motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor. *See Mitchell v. Forsyth*, 472 U.S. 511, 529, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985) (improper intent is a pure question of fact); *Walker v. Horn*, 286 F.3d 705, 710 (3d Cir. 2002).

*Monteiro*, 436 F.3d at 405. *See also Newland v. Reehorst*, 328 F. App'x 788, 791 (3d Cir. 2009) (non-precedential) (cautioning "that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases."); *Schrob v. Catterson*, 967 F.2d 929, 938 (3d Cir. 1992) ("[I]f the plaintiff's allegations are sufficient as a matter of law to avoid an immunity defense, but the defendant denies engaging in the alleged conduct, then discovery may be necessary before [the question of qualified immunity] can be resolved" (internal quotation marks omitted)).

The Third Circuit has stated that its "cases do not provide government officials with clear guidance as to when a government official's own speech can [] constitute unconstitutional retaliation." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 176 (3d Cir. 2016). And very recently, in *Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017), the Court reminded us not to "'define clearly established law at a high level of generality.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011)). Thus it held that although "the 'right to be free from retaliation for one's speech,'" was clearly established, the "right to be free from a retaliatory restriction on communication with one's government" was not. *Id.* at 653 (quoting *Reichle*, 132 S. Ct. at 2094)).

Still, two judges in the District of Delaware have grappled with the specific question of whether freedom from retaliatory defamation is clearly established, only to reach different conclusions. *Compare Rappa v. Hollins*, 991 F. Supp. 367, 382 (D. Del. 1997) ("it was not clearly established that [the plaintiff] had a constitutional right not to be subjected to defamatory remarks in retaliation for engaging in constitutionally protected First Amendment activity"), *aff'd*, 178 F.3d 1280 (3d Cir. 1999), *with Neuberger v. Gordon*, 567 F. Supp. 2d 622, 641 (D. Del. 2008) (framing the relevant inquiry as "whether the right retaliated *against* was clearly established").[20]

This, however, is not an allegation of defamation alone, but defamation-plus. The Mayor's alleged statements might take on a different hue in the context of his ordering the police to remove

---

[20]     Agreeing with *Rappa* are, *e.g.*, *Blume v. Meneley*, 283 F. Supp. 2d 1178, 1188 (D. Kan. 2003) ("[E]ven if a cause of action exists under § 1983 for the alleged defamation, that cause of action is not based on a clearly established legal principle of which defendant [] should have been aware at the time."), and *Guy v. State of Ill.*, 958 F. Supp. 1300, 1310 (N.D. Ill. 1997) (reasoning "it was not 'clearly established' that defamation alone could provide the basis for a violation of plaintiff's first amendment rights").

Fernandes. I therefore will not perform surgery on Count 3, but will permit the allegations to be developed in discovery.

In sum, the motion to dismiss Count 3 as against Mayor Fulop on grounds of qualified immunity is denied.

### 2. Fourth Amendment Claim (Count 4) Against Lewis and Mayor Fulop as Individuals

Plaintiffs have sufficiently alleged Lewis's and Mayor Fulop's violation of Fernandes's Fourth Amendment rights. As to whether the right violated was clearly established, "Police officers clearly know that they need probable cause to arrest someone and we can assume that they know they face personal liability if they arrest someone without probable cause." *George v. Rehiel*, 738 F.3d 562, 583 (3d Cir. 2013); *see also Ciardiello v. Sexton*, 390 F. App'x 193, 198 (3d Cir. 2010) ("In the context of a false arrest claim, we may review whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff . . . ." (internal quotation marks omitted)); *Rios v. City of Bayonne*, No. CIV. 2:12-4716, 2013 WL 6008481, at *6 (D.N.J. Nov. 12, 2013) ("As to false arrest, false imprisonment, and illegal search and seizure, the factual inquiry is whether the information in the possession of the arresting officers was sufficient to constitute probable cause."). As the Complaint describes the scene, Lewis and the other arresting PD officers had virtually no reason to arrest Fernandes (to the extent they *did* arrest him) other than Mayor Fulop's instruction.

Whether it was objectively reasonable for Mayor Fulop to believe that probable cause supported Fernandes's arrest when he allegedly directed Lewis and other PD officers to remove Fernandes from the meeting is an independent inquiry, and one that raises factual questions I cannot resolve at this stage. *See Blaylock v. City of Philadelphia*, 504 F.3d 405, 411 (3d Cir. 2007) ("The qualified immunity standard is one of objective legal reasonableness. Although the question of what facts the arresting officer knows is relevant to the inquiry, his subjective

motivation for making the arrest is not." (internal quotation marks and citations omitted)); *cf. Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 794 (3d Cir. 2000) (explaining that instigators of an arrest may have had information they did not provide to the arresting officer that would negate their reasonable belief of probable cause, even if the arresting officer had a reasonable belief of probable cause).

Accordingly, I cannot determine whether Lewis and Fulop are immune from suit until the factual record sheds more light on what information they had before them (e.g., what behavior they observed in Fernandes).

### D. Common Law Claims

Plaintiffs also seek to hold Mayor Fulop liable for defamation and Jersey City liable for negligence. No one disagrees that New Jersey state law applies to these claims.

### 1.    *Count 5—Defamation*

Under New Jersey law, the essential elements of defamation, aside from damages, are "'(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.'" *G.D. v. Kenny*, 411 N.J. Super. 176, 186, 984 A.2d 921, 927–28 (App. Div. 2009), *aff'd*, 205 N.J. 275, 15 A.3d 300 (2011) (quoting *Leang v. Jersey City Bd. of Educ.*, 198 *N.J.* 557, 585, 969 *A.2d* 1097 (2009)). Plaintiffs allege only slander (oral defamation), not libel (written defamation). (*see* Compl. ¶¶ 92–98) To satisfy the pleading standards of Fed. R. Civ. P. 8, a plaintiff must at a minimum "plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication.'" *Foy v. Wakefern Food Corp.*, No. CIV.A 09-1683(JLL), 2010 WL 147925, at *6 (D.N.J. Jan. 7, 2010) (quoting *Zoneraich v. Overlook*

*Hosp.,* 212 N.J. Super. 83, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986)).[21]

Additionally, a slander claim not rising to the level of slander per se "(e.g., accusation of a crime, a loathsome disease, misfeasance in business, or serious sexual misconduct") generally require[s] proof of special damages—an economic or pecuniary loss." *W.J.A. v. D.A.,* 210 N.J. 229, 240, 43 A.3d 1148, 1154 (2012); *see also Marino v. Westfield Bd. of Educ.,* No. 16CV00361WHWCLW, 2017 WL 216691, at *6 (D.N.J. Jan. 18, 2017) ("'Special damages are defined as harm of a material or pecuniary nature.'" (quoting *Ward v. Zelikovsky,* 136 N.J. 516, 540, 643 A.2d 972, 984 (1994))). Under the Federal Rules of Civil Procedure, special damages "must be specifically stated." Fed. R. Civ. P. 9(g).

The Complaint, by reference to excerpts from counsel's February 8, 2016 letter to Jeremy Farrell, alleges that Mayor Fulop told audience members at the February 3, 2016 meeting that Fernandes attends "every single one of these meetings," "made a disruption for twenty to thirty minutes' or five to ten minutes'" at meetings, and that the Property has been "cited for violations." (Compl. ¶ 47) The Complaint further alleges that their counsel's February 8, 2016 letter informed Farrell that Mayor Fulop's previous statements were untrue. Nevertheless, Mayor Fulop stated during a March 14, 2016 meeting that Fernandes "is a disgruntled person because his property had been cited for numerous violations by the City, and that the matter is currently the subject of litigation." (*Id.* ¶¶ 52, 95)

The defendants make two arguments as to why the Plaintiffs fail to state a prima facie case. First, they say, Mayor Fulop's alleged

---

21    Although New Jersey imposes a heightened pleading standard whereby a claimant must allege the specific defamatory words used, in this Court the ordinary federal pleading standard applies. *Mangan v. Corp. Synergies Grp., Inc.,* 834 F.Supp.2d 199, 204 (D.N.J. 2011) (noting that a plaintiff "must allege the elements of defamation as applied by New Jersey law to a degree of sufficient specificity to satisfy the standards outlined in Rule 8.").

statements were not false. The Complaint, however, alleges that they were. Such questions of fact cannot be resolved on this motion.

Second, the defendants argue that Plaintiffs have failed to adequately plead special damages. (*Id.* 17) I agree. Plaintiffs allege that Mayor Fulop's slander has "injured their reputation, caused [them] to lose the goodwill o[f] others, and has injured [them] in their business." (Compl. ¶ 98) These are not statements, such as false attributions of criminality or accusations that a person cannot properly conduct his business, trade, or profession, that naturally give rise to an inference of damages. *See generally DeVries v. McNeil Consumer Prod. Co.*, 250 N.J. Super. 159, 166, 593 A.2d 819, 824 (App. Div. 1991). The Complaint provides no specific (or even general) facts suggesting that Plaintiffs have suffered economic or pecuniary loss. For example, it does not state what business Plaintiffs are in, or what goodwill they allegedly enjoy[ed]. Accordingly, the Complaint fails to state a claim for slander, and the motion to dismiss is granted as to Count 5.[22]

### 2. *Count 6—Negligence*

Under New Jersey law, a cause of action for negligence has four essential elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre*, 221 N.J. 36, 51, 110 A.3d 52, 61 (2015) (internal quotation marks omitted). Here, Plaintiffs allege the Building Department issued them a permit to alter the Property, then ordered Plaintiffs to stop work on the Property after siding had been removed, resulting in weather damage.

Public entities, however, enjoy certain immunities from a suit for negligence. In particular, "[p]ublic entities are immune from negligence

---

[22]  Because Plaintiffs have not stated a claim for slander, I do not reach whether Mayor Fulop would be entitled to state law qualified immunity under the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:1-1 *et seq.*, or whether Plaintiffs' alleged failure to comply with that Act's requirement of filing a TCN renders their slander claim jurisdictionally infirm. Should the Plaintiffs seek to amend, those issues might again arise.

suits unless such suits are specifically authorized by the NJTCA. Accordingly, the NJTCA must be strictly construed to permit lawsuits only where specifically allowed." *Gourley v. Twp. of Monroe*, No. A-1595-11T2, 2013 WL 68715, at *3 (N.J. Super. Ct. App. Div. Jan. 8, 2013) (citation omitted); *see also* N.J. Stat. Ann. § 59:1-2 (West) ("[It] is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.")

The NJTCA explicitly immunizes public entities such as the City from suits for damages based on denial or suspension of a permit or similar authorization:

> A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked.

N.J. Stat. Ann. § 59:2-5.

The applicability of the NJTCA immunity is apparent from the face of the Complaint. It may be possible to plead around it in an amended version of Count 6. As it stands, however, Count 6 must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the complaint is **GRANTED** in part and **DENIED** in part, as follows:

**A.** The motion is granted as to Counts 2, 5, and 6, which are dismissed in their entirety, **WITHOUT PREJUDICE** to the filing of a proposed amended complaint within 30 days.

**B.** The motion is denied as to Count 1, which remains against Jersey City; and

**C.** The motion is denied as to Counts 3 and 4, which remain

against Jersey City, Mayor Fulop in his individual capacity, and Anthony B. Lewis in his individual and official capacities.

Dated: June 27, 2017

KEVIN MCNULTY
United States District Judge